## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH LAMACCHIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02:11-cv-00498 |
| | ) | |
| MICHAEL ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

April 9, 2012

### I.      Introduction

Joseph Lamacchia ("Plaintiff"), brought this action pursuant to 42 U.S.C.

§ 1383(c)(3) for judicial review of the final determination of the Commissioner of Social

Security ("Commissioner"), which denied Plaintiff's application for supplemental

security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-

1383f.

### II.      Background

Plaintiff was 34 years old on the date his application was filed, making him a

younger person whose age does not affect his ability to adjust to other work pursuant to

20 C.F.R. § 416.963.  He is a high school graduate, capable of communicating in English,

with three years of vocational training as a mechanic.  (R. 28, 122).  He has past relevant

work experience as an auto mechanic and kitchen installer.  (R. 118).  The vocational

expert who testified at Plaintiff's administrative hearing described the job of auto

mechanic as skilled work performed at a medium level of exertion and the job of kitchen installer as low-level skilled worked performed at the heavy exertional level.  (R. 23). Plaintiff has not engaged in substantial gainful activity since the alleged onset date.

## A.   Medical Evidence

The record reflects that Plaintiff has a history of chronic back pain, which was treated with opioids, prior to the alleged onset date of June 10, 2007.  However, there is no medical documentation in the record prior to March 2, 2008.  On that date, Plaintiff was apparently in a car accident, after which he was transported by ambulance to Jefferson Regional Medical Center ("Jefferson"), complaining of pain in his head, neck and back.  (R. 150).  Plaintiff left the hospital before being examined.  (R. 151).

On June 26, 2008, Plaintiff was again taken by ambulance to Jefferson after he experienced a seizure while driving.  (R. 205-06, 215).  In the ER, he reported that he had been taking Xanax to treat anxiety but had been weaning himself off of it in the preceding two weeks.  (R. 199).  He also reported that he had stopped taking medications for his chronic back pain about a month prior to presenting to the ER.  (R. 199).  On examination by Sundeep Ekbote, M.D., Plaintiff had tenderness over the lower thoracic and upper lumbar regions, but overall was not in acute distress.  (R. 200).  Dr. Ekbote diagnosed Plaintiff with a seizure, and noted that he had history of substance abuse.  (R. 204). Further, because the seizure appeared to be related to withdrawal, Dr. Ekbote recommended that Plaintiff be admitted to the hospital.  (R. 203).

After being admitted, Plaintiff underwent a consultative examination with Eric Chamberlin, M.D., a spine specialist, during which Plaintiff stated that he had been taking "heavy dose narcotics" for the past two years.  (R. 225).  According to Dr.

2

Chamberlin, Plaintiff appeared pleasant and was not in acute distress. (R. 225). Further, although he had tenderness in his lower thoracic and upper lumbar spine, he experienced no pain while in motion. (R. 225). Dr. Chamberlin decided to prescribe Plaintiff a back brace. (R. 219-21, 226). In addition, like Dr. Ekbote, Dr. Chamberlin suspected that Plaintiff's seizure was due to tapering of benzodiazepines, i.e. anti-anxiety medications. (R. 225).

Plaintiff also underwent a neurological consultation on June 26, 2008. (R. 217). John B. Talbott, M.D., conducted the consultation and recorded in his notes that Plaintiff reported experiencing thoracolumbar pain. (R. 217-18). Dr. Talbott also noted that Plaintiff's urine tested positive for anti-depressants. (R. 217). He concluded that Plaintiff may have suffered a withdrawal convulsion, which apparently resulted in the car accident, but he also noted that he "question[ed] this man's credibility" and was "not sure if anything he says is entirely correct." (R. 218). Nonetheless, Dr. Talbott ordered Plaintiff to not operate a vehicle until he was seizure-free for at least six months. (R. 218).

At Dr. Talbott's recommendation, Stephen Patternac, M.D., a drug and alcohol addiction specialist, also examined Plaintiff. (R. 218, 219, 222-23). Although Dr. Patternac suspected that Plaintiff had experienced a withdrawal seizure, he noted that he had seen patients discontinue the level of Xanax that Plaintiff stated he was taking without suffering any problems. (R 222). He also indicated in his notes that the prescription pain reliever Ultram could produce seizures if used to excess. (R. 222).

Over the course of his hospital stay, Plaintiff underwent several tests and x-rays. First, a head CT scan returned negative results, and a brain MRI was unremarkable. (R.

3

239, 250).  Next, x-rays taken on June 27, 2008 showed 50 percent compression of T12, a

spinal nerve of the thoracic segment.  (R. 236, 244, 247-48).  The following day, Plaintiff

had thoracic spine and lumbar MRIs taken.  (R. 241-42, 253-54, 274).  The thoracic spine

MRI showed a compression fracture of the T12, with mild to moderate central spinal

stenosis.  (R. 241-42).  The lumbar MRI revealed anatomical alignment and pristine

vertebral disks, with a stress fracture in one of the vertebrae.  (R. 241-42).  Finally, on

July 2, 2008, thoracic spine and lumbar spine x-rays were taken, showing anterior

wedging of T12, but a normal lumbar spine.  (R. 243-44).  That same day, Plaintiff was

discharged with a diagnosis of a compression fracture of T12 and seizure disorder

resulting from benzodiazepine withdrawal.  (R. 197-98).

On August 14, 2008, Plaintiff had a follow-up with Dr. Chamberlin.  (R. 260).

At that time, he had been wearing his back brace for about six weeks.  (R. 260).  Because

Dr. Chamberlin was not satisfied with Plaintiff's progress with the back brace, he told

Plaintiff that he should consider having surgery.  (R. 260).

Later in August, Plaintiff began treatment with Rodney B. Dayo, D.O, a pain

management specialist.  (R. 276).  At their initial visit, Dr. Dayo recorded in his notes

that Plaintiff did have a compression fracture.  (R. 276).  However, he also noted that he

was "concerned of [Plaintiff's] integrity because he was a former patient of Dr. Cawog in

Westmoreland County."  (R. 276).  As a result, Dr. Dayo decided not to place Plaintiff on

a narcotic regimen, noting that Plaintiff may respond to Calictonin and NSAIDS better if

his "pain is real."  (R. 276).

On August 19, 2008, Plaintiff underwent back surgery with Dr. Chamberlin.  (R.

157, 162-63, 179, 264, 261-62, 267-68).  His post-operative pain was managed with

Oxycontin, Roxicode, and Dilaudid, each of which was prescribed by Dr. Dayo.  (R. 262).  Dr. Dayo planned to discontinue these medications in four to eight weeks, noting that "[t]here are some questionable things that have gone on in recent visits that make us extremely hesitant to place him on a long term narcotic regimen."  (R. 262).  Plaintiff was discharged on August 24, 2008 and directed to avoid heavy lifting, pushing, or pulling. (R. 262).

Plaintiff followed up with Dr. Chamberlin on September 3, 2008, at which time he was "doing extremely well."  (R. 259).  According to Dr. Chamberlin's notes, Plaintiff "look[ed] 100% better than he did preoperatively.  (R. 259).  He was "up straight, [and] walking around at ease."  (R. 259).  Dr. Chamberlin further noted that Plaintiff's incision had healed, that he had 5/5 strength bilaterally in his lower extremities, and that his x-rays were "perfect."  (R. 259).  Later that month, Plaintiff began to wean off of his pain medications, after consulting with Mark G. Boles, M.D., a third pain-management specialist.  (R. 315).

Plaintiff next saw Dr. Chamberlin on October 8, 2008.  (R. 258).  Dr. Chamberlin again noted that Plaintiff was progressing very well.  (R. 258).  His x-rays looked "outstanding," he walked "fine," and he was neurologically intact.  (R. 258).

On November 24, 2009, Mary Ellen Wyszomierski, M.D., a state agency physician, reviewed Plaintiff's file and assessed a fracture of T12 and lumbar spondylosis.  (R. 281).  Based on her review of all of the medical records, particularly Dr. Chamberlin's notes indicating that Plaintiff was doing well and had recovered strength in his lower extremities, Dr. Wyszomierski concluded that Plaintiff had the residual functioning capacity for light work with occasional postural maneuvers.  (R. 282-86).

She also opined that Plaintiff had the following limitations: he should avoid concentrated exposure to extreme cold and wetness and moderate exposure to vibration and hazards. (R. 284). Further, she opined that Plaintiff would make a satisfactory recovery before the completion of the 12-month period required for a finding of disability under the Act. (R. 287).

Two days later, Manella Link, Ph.D., completed a Psychiatric Review Technique form, in which she indicated that Plaintiff's pain disorder was not severe. (R. 288-300). She found that Plaintiff had no restriction of activities of daily living; no difficulties in maintaining social functioning; and mild difficulties in concentration, persistence, and pace. (R. 298). She also noted that Plaintiff was not receiving treatment from any mental health treating sources. (R. 300).

On December 4, 2008, Plaintiff saw Dr. Talbott in order to complete the necessary paperwork to reapply for a driver's license. (R. 301-03). On examination, Dr. Talbott found that Plaintiff was able to walk normally and had not experienced any additional seizure activity for six months, so he completed the paperwork to allow Plaintiff to reapply for a license. (R. 301-03).

Throughout December 2008 and January 2009, Plaintiff continued to see Dr. Boles, who reported that Plaintiff was progressing well. (R. 312-13). Dr. Boles refilled Plaintiff's medications on December 31, 2008. (R. 312). On January 13, 2009, however, Dr. Boles refused to refill Plaintiff's Dilaudid prescription after Plaintiff attempted to renew it too early. (R. 312).

During an appointment with Dr. Chamberlin on January 23, 2009, Plaintiff again appeared to be doing well. (R. 304). Although he complained of sciatic pain in his left

leg, he displayed 5/5 strength and no nerve tension signs.  (R. 304).  His x-rays, however, did show a spondylolyosis and a slight spondylolisthesis at L5-S1.  (R. 304).  According to Dr. Chamberlin's notes, Plaintiff could have opted to have another surgery, but Dr. Chamberlin recommended against it because so little time had passed since Plaintiff's first procedure.  (R. 204).  Furthermore, Dr. Chamberlin noted that Plaintiff was on "a lot of pain medication," and refused Plaintiff's request to prescribe any additional pain relievers because Plaintiff was already under the care of a pain-management specialist. (R. 304).  Instead, Dr. Chamberlin prescribed physical therapy.  (R. 305).

On January 28, 2009, Plaintiff saw Dr. Boles, whom he told he "needed" pain medications reportedly for a "new fracture" in his lower back.  (R. 304).  Plaintiff also reported to Dr. Boles that he and Dr. Chamberlin were discussing additional surgery.  (R. 311).  Dr. Boles refilled Plaintiff's prescription, but told him that after March 1, 2009, he would no longer do so.  (R. 311).

On March 3, 2009, Plaintiff presented to Dr. Boles, telling him that he had "lost his [Oxycodone and Xanax] prescriptions" and had "attempted to make a police report without success."  (R. 310).  As a result, Dr. Boles refilled Plaintiff's prescription.  (R. 310).  At Plaintiff's next visit with Dr. Boles, just one week later, it was noted that Plaintiff was "doing well."  (R. 309).  Dr. Boles refilled Plaintiff's prescription, but noted that Plaintiff was transferring to another pain-management specialist.  (R. 309).

On April 8, 2009, Plaintiff told Dr. Boles that he had made an appointment at Jefferson Pain and Rehabilitation Center.  (R. 308).  According to Dr. Boles, it was too early to refill Plaintiff's breakthrough pain reliever, but he gave him a prescription for Oxycodone.  (R. 308).  Dr. Boles saw Plaintiff twice over the next three weeks, and

during both of those visits, he discussed cutting back Plaintiff's pain medications.  (R. 306-07).  He emphasized that it would be Plaintiff's responsibility to wean himself off of his medications.  (R. 307).  Further, although Dr. Boles renewed Plaintiff's Oxycodone prescription on April 22, 2009, he made it clear that this was going to have to last for the next six weeks.  (R. 307).

In early June 2009, Plaintiff began treating at Jefferson Pain and Rehabilitation Center with Victoria Sepesky, M.D.  (R. 319-21).  On June 10, 2009, after her initial visit with Plaintiff, Dr. Sepesky wrote a letter to Bushra Haider, M.D. which included included information about Plaintiff's history of present illness ("HPI"), along with her physical examination findings, assessment, and treatment plan.[1]  (R. 319-321).  Under HPI, Dr. Sepesky indicated that Plaintiff stated that he continued to suffer pain.  (R. 319).  His pain was reportedly constant and made it difficult for him to do "anything throughout the day."  (R. 319).  Further, it was noted that Plaintiff reported that his daily activities were limited due to range of motion loss; that he was having difficulty sleeping; and that his tolerance for sitting, standing, and riding in a car was impaired because he had to frequently change positions.  (R. 305).  Plaintiff also reported that he was not scheduled to start attending physical therapy for one year (although Dr. Chamberlin had actually prescribed him physical therapy following his surgery).  (R. 305, 319).  The letter indicated that Dr. Sepesky's diagnosis was chronic pain syndrome and rhomboid strain.  (R. 320).  Further, Dr. Sepesky indicated that she treated Plaintiff's pain with a nerve

---

[1] The letter indicates that Plaintiff's back condition was "complicated" when he was driving his car on June 26, 2009 and "felt immediate stabbing pain in his back.  He pulled off the road and his girlfriend called the ambulance.  He was taken to the hospital."  (R. 319).  It appears that she is referring to the car accident on June 26, 2008 – not 2009 – after which Plaintiff was taken to the emergency room at Jefferson.

block injection, and refilled the medications from which Dr. Boles had attempted to wean him.  (R. 321).

On July 8, 2009, Plaintiff received another nerve block injection from Dr. Sepesky.  (R. 318).  In addition, Dr. Sepesky assessed Plaintiff's functioning level at 6-7 on a scale from 0 to 10.[2]  (R. 318).  Over the next several months (August 2009 until March, 3 2010) Plaintiff continued to have his pain medications refilled by Dr. Sepesky. (R. 316-17, 322).  During this period, Dr. Sepesky noted gradual improvement in Plaintiff's level of functioning, which rose from a 7-8 out of 10 in August 2009 to an 8-9 out of 10 in March 2010.  (R. 316-17, 322).

### B.    Procedural History

Plaintiff filed for SSI on September 29, 2008, alleging disability as of June 10, 2007 due to "back problems and surgery."  (R. 91-97, 117).  The claim was initially denied on November 26, 2008, and Plaintiff filed a timely written request for hearing on January 5, 2009.  (R. 11).  An administrative hearing was held on April 8, 2010 in Pittsburgh before ALJ Lamar W. Davis, at which Plaintiff was represented by counsel and testified.  Charles M. Cohen, Ph.D., an impartial vocational expert also testified.  (R. 25-51).

On June 16, 2010, the ALJ rendered an unfavorable decision to Plaintiff.  (R. 26). The ALJ's decision became the final decision of the Commissioner on March 7, 2011, when the Appeals Council denied Plaintiff's request to review the decision of the ALJ. (R. 8-10).

---

[2] According to Dr. Sepesky's treatment notes, a functional rating of 0 would mean that Plaintiff's pain had a severe impact on his ability to function at home and at work, while a rating of 10 would mean that Plaintiff had returned to the level of functioning prior to his chronic pain.  (R. 318).

On April 25, 2011, Plaintiff filed a Complaint in this Court in which he seeks judicial review of the decision of the ALJ.  The parties have filed cross-motions for summary judgment.  (Document Nos. 6 and 8).  Plaintiff alleges that the ALJ erred by (1) discounting Plaintiff's credibility; and (2) failing to give Dr. Sepesky's opinion controlling or at least deferential weight.  For his part, the Commissioner contends that the decision of the ALJ should be affirmed as it is supported by substantial evidence. The Court agrees with the Commissioner and will therefore grant the motion for summary judgment filed by the Commissioner and deny the Plaintiff's motion for summary judgment.

## III.     Legal Analysis

### A.     <u>Standard of Review</u>

The Act limits judicial review of disability claims to the Commissioner's final decision.  42 U.S.C. §§ 405(g)/1383(c)(3).  If the Commissioner's finding is supported by substantial evidence, it is conclusive and must be affirmed by the Court.  42 U.S.C. § 405(g); *see Rutherford v. Barnhart,* 399 F.3d 546, 552 (3d Cir. 2005).  The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389 (1971); *Capato v. Comm'r of Social Sec.*, 631 F.3d 626, 628 (3d Cir. 2010) (internal citation omitted).  It consists of more than a scintilla of evidence, but less than a preponderance.  *Thomas v. Comm'r of Social Sec.*, 625 F.3d 798 (3d Cir. 2010).

When resolving the issue of whether an adult claimant is or is not disabled, the Commissioner utilizes a five-step sequential evaluation.  20 C.F.R. §§ 404.1520 and

416.920 (1995).  This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment

that meets or equals the requirements of a listed impairment, (4) can return to his or her

past relevant work, and (5) if not, whether he or she can perform other work.  *See* 42

U.S.C . § 404.1520; *Newell v. Comm'r of Social Sec.*, 347 F.3d 541, 545-46 (3d Cir.

2003) (quoting *Burnett v. Comm'r of Social Sec.*, 220 F.3d 112, 118-19 (3d Cir. 2000)).

To qualify for disability benefits under the Act, a claimant must demonstrate that

there is some "medically determinable basis for an impairment that prevents him or her

from engaging in any substantial gainful activity for a statutory twelve-month period."

*Fargnoli v. Halter*, 247 F.2d 34, 38-39 (3d Cir. 2001) (internal citation omitted); 42

U.S.C. § 423 (d)(1) (1982).

This may be done in two ways:

> (1)    by introducing medical evidence that the claimant is
> disabled per se because he or she suffers from one or more of a number of
> serious impairments delineated in 20 C.F.R. Regulations No. 4, Subpt. P,
> Appendix 1.  See *Heckler v. Campbell*, 461 U.S. 458 (1983); *Newell*, 347
> F.3d at 545-46; *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004); or,

> (2)    in the event that claimant suffers from a less severe
> impairment, by demonstrating that he or she is nevertheless unable to
> engage in "any other kind of substantial gainful work which exists in the
> national economy . . . ."  *Campbell*, 461 U.S. at 461 (citing 42 U.S.C. §
> 423 (d)(2)(A)).

In order to prove disability under the second method, a claimant must first

demonstrate the existence of a medically determinable disability that precludes plaintiff

from returning to his or her former job.  *See Newell*, 347 F.3d at 545-46; *Jones*, 364 F.3d

at 503.  Once it is shown that claimant is unable to resume his or her previous

employment, the burden shifts to the Commissioner to prove that, given the claimant's

mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Rutherford*, 399 F.3d at 551; *Newell*, 347 F.3d at 546; *Jones*, 364 F.3d at 503; *Burns v. Barnhart*, 312 F.3d 113, 119 (3d Cir. 2002).

Where a claimant has multiple impairments that may not individually reach the level of severity necessary to qualify a single impairment for Listed Impairment status, the Commissioner nevertheless must consider all of the impairments in combination to determine whether, collectively, they meet or equal the severity of a Listed Impairment. *Diaz v. Comm'r of Social Sec.*, 577 F.2d 500, 502 (3d Cir. 2010); *see also* 42 U.S.C. § 423(d)(2)(C) ("in determining an individual's eligibility for benefits, the Secretary shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity").

## B.      The ALJ's Decision

In this case, the ALJ found that Plaintiff had the following impairments, which singularly or in combination, were severe: musculoskeletal impairments of the back including a T12 fracture requiring fusion of the T10 through L2 and spondyloolsysis and a slight spondylolisthesis at L5-S1; one generalized seizure in June 2008; and anxiety. (R. 13).  Nonetheless, based on all of the medical evidence of record, the ALJ concluded that Plaintiff retained the residual functioning capacity ("RF") to perform light exertional work, with a sit-stand option, subject to several limitations:

> use of bilateral upper extremities is precluded for overhead reaching or unsupported forward extension at shoulder height.  He is also limited bilaterally in the use of the upper extremities for fine manual dexterity, fingering, pinching or keyboarding.  [Plaintiff] is also precluded from all but incidental postural adaptation (stooping, kneeling, crouching, crawling, balancing, and climbing) with no exposure to hazards such as

unprotected heights and dangerous machinery, and is precluded from exposure to environmental factors such as temperature extremes of less than 40° or more than 90°F on a continuous basis.  Furthermore, he is relegated to simple, routine, repetitive tasks involving no more than incidental exercise of independent judgment or discretion, and changes in work processes and no interaction with the general public.

(R. 16).

Given the weight of the medical evidence and Plaintiff's contemporaneous statements to his treating sources, the ALJ found that Plaintiff's statements at his hearing with respect to "the intensity, persistence and limiting effects of his symptoms" were not fully credible.  (R. 18).  Specifically, the ALJ found that the record was "replete with inconsistencies" and that, taken as a whole, it did not support Plaintiff's testimony regarding the severity of his pain, the limitations in performing household tasks, or the necessity to lie down four to five times a day.  (R. 22).  The ALJ concluded that Plaintiff's poor work history, as reflected in his earnings record, also undermined his credibility.  (R. 22).

At the fourth step of the sequential evaluation, the ALJ, guided by the testimony the impartial vocational expert, determined that Plaintiff is unable to perform his past relevant work as an auto mechanic or kitchen installer.  (R. 22-23).  At the fifth step, however, the ALJ concluded that, in spite of Plaintiff's limitations, he was capable of performing a significant number of jobs in the national economy.  (R. 23).  The ALJ listed as examples the jobs of inspector, with more than 100,000 jobs existing in the national economy; packer, with more than 190,000 jobs existing in the national economy; and assembler, with more than 350,000 jobs existing in the national economy.  (R. 23-24).  The ALJ held, therefore, that Plaintiff was not disabled within the meaning of the Act.  (R. 24).

**C.**     <u>Discussion</u>

As set forth in the Act and applicable case law, this Court may not undertake a de novo review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986), *cert. denied*, 482 U.S. 905 (1987).  The Court must simply review the findings and conclusions of the ALJ to determine whether they are supported by substantial evidence.  42 U.S.C. § 405(g); *Schaudeck v. Comm'r of Social Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

In support of his Motion for Summary Judgment, Plaintiff alleges two errors by the ALJ.  First, he argues that Plaintiff's subjective complaints of pain are entitled to full credibility.  Second, he argues that the ALJ erred by failing to give Dr. Sepesky, the pain management specialist, controlling or at least deferential weight.  The Court will address each of these claims *seriatim*.

1.     *The ALJ did not err in assessing Plaintiff's credibility.*

Plaintiff challenges the ALJ's assessment of his credibility, arguing that "it is clear that [he] suffers from continuous, severe pain and that he has impairments which can be expected to produce pain symptoms."  He further argues that the objective medical evidence related to his back pain is consistent with his subjective complaints, thereby entitling him to a finding of full credibility.

The United States Court of Appeals for the Third Circuit has held that "[a]n ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence."  *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993).  "Where a medical impairment that could reasonably cause

14

the alleged symptoms exists, the ALJ must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work." *Bair v. Comm'r of Social Sec.*, 2010 WL 3222123, at *9 (W.D. Pa. July 23, 2010).  Further, the ALJ must determine whether a claimant is accurately stating the degree of pain or the extent to which he is disabled by it.  *See* 20 C.F.R. § 404.1529(c); *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999).

An ALJ may reject a claimant's subjective claims, partially or fully, if he does not find them credible based on the other evidence of record.  *Schaudeck*, 181 F.3d at 433. However, where a claimant's subjective complaints of pain are reasonably supported by objective medical evidence, an ALJ may not discount the claimant's statements without contrary medical evidence.  *See Gupta v. Astrue*, 2010 WL 2835719, at *7 (W.D. Pa. July 16, 2010).  As the Court of Appeals has explained:

> in all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations.  The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work.

*Schaudeck*, 181 F.3d at 433.

In his decision, the ALJ acknowledged Plaintiff's complaints of chronic back pain.  (R. 22).  He found, however, that Plaintiff's claim that his allegedly severe back pain precluded employment was not credible due to a lack of support in the record.  (R. 18).

The ALJ based this determination, in part, upon Plaintiff's history of treatment with Dr. Chamberlin, who performed Plaintiff's back surgery on August 19, 2008.  (R.

19).  In the months following the surgery, Dr. Chamberlin noted on at least two occasions that Plaintiff was 'doing well" and that his x-rays looked "perfect" and "outstanding." (R. 19-20).  Importantly, Dr. Chamberlin never makes any mention that Plaintiff's lingering pain would preclude him from working.  (R. 19-20).

The ALJ also considered Plaintiff's history of treatment with Dr. Boles, the pain management specialist who prescribed Plaintiff's medications from September 2008 through April 2009.  (R. 20).  Like Dr. Chamberlin, Dr. Boles repeatedly noted that Plaintiff was doing well and did not provide any opinions as to Plaintiff's level of functioning.  (R. 20).  He also made it clear that he believed Plaintiff was capable of slowly discontinuing his pain medications.  (R. 20).

In addition, the ALJ noted that Plaintiff rated the pain in his shoulder blades, low back, and left hip 7 out of 10 when he began treating with Dr. Sepesky in June 2009.  (R. 20).  (R. 21).  However, upon physical examination, Plaintiff's range of motion was within normal limits; he was able to heel and tip toe stand; and he demonstrated normal strength on his right side and 4/5 strength on his left.  (R. 21).  Subsequent treatment notes from Dr. Sepesky indicate that Plaintiff's pain level was 6 out of 10 as of October 2009 and again in March 2010 and that his functioning level was steadily improving.  (R. 21).

The ALJ also discussed the findings of Dr. Wyszomierski, a State Agency consultant who reviewed Plaintiff's file November 2008.  (R. 21).  Dr. Wyszomierski opined that Plaintiff could do light work with occasional postural maneuvers, subject to a number of limitations which the ALJ expressly took into account in reaching his RFC finding.  (R. 21).

Plaintiff points to the statements in Dr. Sepesky's June 10, 2009 letter related to his pain and limitations in his daily activities as substantiating his subjective complaints of pain.  Most of that which appears in the letter under the heading HPI, however, is based on Plaintiff's own statements about his condition, as related to Dr. Sepesky during Plaintiff's initial visit with her.  As our appellate court has established,

> the mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion . . . An ALJ may discredit a physician's opinion on disability that was premised largely on the claimant's own accounts of her symptoms and limitations when the claimant's complaints are properly discounted.

*Morris v. Barnhart*, 78 Fed. Appx. 820, 825 (3d Cir. 2003).  Thus, the ALJ was free to conclude that the statements in the letter, which merely repeated Plaintiff's subjective complaints, were not sufficient to substantiate the legitimacy of those very same complaints.

Ultimately, the ALJ found that Plaintiff's back impairment could reasonably be expected to result in mild-to-moderate pain and work-related limitations.  (R. 21-22).  Nonetheless, it did not support the disabling degree of severity that Plaintiff claimed.  (R. 21-22).  That conclusion is entirely consistent with the medical evidence of record.  No physician ever opined that Plaintiff's pain rendered him unable to sustain employment.  Furthermore, the record contains only scant references to Plaintiff's functional capacity.  In fact, the most recent assessment of his level of functioning, dated March 2010, indicated that Plaintiff functioned at a level of 8-9 out of 10, thereby contradicting his claim of total disability.

The ALJ's credibility finding was also consistent with the record, which, as the ALJ noted, was replete with inconsistent statements by Plaintiff and statements by his

physicians casting doubt on his credibility.  As just one example, Dr. Talbott, who

conducted a neurological examination of Plaintiff on June 26, 2008, expressly

"question[ed] this man's credibility" and was "not sure if anything he says is entirely

correct."  (R. 218).  Accordingly, because the ALJ specifically discussed Plaintiff's

subjective complaints and contrasted them with the underlying objective medical

evidence, his credibility finding is supported by substantial evidence.

2.      *The ALJ did not err in not according controlling weight to Dr. Sepesky.*

        Plaintiff argues that the ALJ failed to properly consider the assessment of Dr.

Sepesky, one of the four pain management specialists who treated Plaintiff.  The ALJ

determined that Dr. Sepesky's assessment of Plaintiff's condition could not be given full

weight because she relied primarily on Plaintiff's prior medical history and subjective

complaints of pain, which the ALJ found were not supported by the record evidence.

According to Plaintiff, however, Dr. Sepesky "opined" that Plaintiff could not tolerate

standing or sitting for 20 minutes and would have to lie down several times throughout

the day, which would preclude plaintiff from engaging in substantial gainful activity.

Further, Plaintiff argues that Dr. Sepesky is trained to evaluate subjective complaints of

pain and rely on such complaints in determining her patient's treatment needs.  Thus, he

argues that the ALJ's rationale for rejecting Dr. Sepesky's statements in favor of the

conflicting medical evidence in the record is erroneous.  The Court does not agree.

        In general, "a treating physician's opinion that is consistent with other substantial

evidence should be afforded greater weight than other medical opinions."  *Morris*, 79

Fed. Appx. at 823.  This is especially true "'when [her] opinions reflect expert judgment

based on a continuing observation of the patient's condition over a prolonged period of

time.'" *Brownawell v. Comm'r of Social Sec.*, 554 F.3d 352, 355 (3d Cir. 2008) (quoting *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)); *see also* 20 CFR § 416.927(d)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). As the regulations explain,

> these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 CFR § 416.927(d)(2).

The statements by Dr. Sepesky on which Plaintiff relies as establishing his inability to work appeared in her June 10, 2009 letter to another physician, which was written after Dr. Sepesky treated Plaintiff on only one occasion. That one visit could not establish the "detailed, longitudinal picture" of Plaintiff's impairments that provides the rationale for according controlling weight to treating sources. In addition, the record reflects that Dr. Sepesky saw Plaintiff just four more times after his initial visit. (R. 316-19, 322). Even taking those visits into account, Dr. Sepesky's statements do not necessarily reflect judgment based on "continuing observation of the patient's condition over a prolonged time." *See Morris*, 78 Fed. Appx. at 823 (finding that physician's opinion was not entitled to controlling weight after he saw plaintiff only three or four times over two or three months). Thus, contrary to Plaintiff's argument, Dr. Sepesky is not entitled to a presumption of controlling weight.

Assuming, *arguendo*, that Dr. Sepesky could be considered a treating source, as defined by the regulations, at the time she wrote the June 10 letter, the ALJ still did not

err in discrediting her statements.  First, the statements on which Plaintiff relies are not

medical opinions.  *See* 20 C.F.R. § 416.927(a)(2) (defining medical opinions as

"statements from physicians and psychologists or other acceptable medical sources that

reflect judgments about the nature and severity of your impairment(s), including your

symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and

your physical or mental restrictions.").  As discussed above, the HPI section of the June

10 letter merely memorialized Plaintiff's subjective complaints of pain and could thus be

rejected insofar as the subjective complaints themselves were inconsistent with the other

medical evidence of record.  *See Morris*, 78 Fed. Appx. at 825.

Second, even if the statements constituted an opinion as defined by the

regulations, an ALJ may reject a treating physician's opinion on the basis of conflicting

medical evidence as long as he considers the opinion and gives some reason for rejecting

it.  *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999).  In this case, the ALJ did just

that, deciding not to give full weight to Dr. Sepesky because he found her statements

inconsistent with the weight of the objective medical evidence.  Specifically, the ALJ

noted that the record contained no evidence relative to the period between the alleged

onset date and March 2008 and that no medical source had ever indicated that Plaintiff

was unable to work.  In addition, the state agency consultant found that Plaintiff retained

an RFC to perform the demands of light work.  Similarly, Dr. Sepesky herself noted that

Plaintiff's functional level was steadily improving.  (R. 316-17, 322).  For example, in

August 2009, it was rated at 7-8 out of 10.  (R. 317).  By March 2010, it had increased to

8-9 out of 10. (R. 322).

After considering Dr. Sepesky's statements and providing his reason for rejecting them, the ALJ was "free to choose the medical opinion of one [medical professional] over that of another." *Diaz*, 577 F.3d at 505 (citing *Cotter v. Harris*, 642 F.2d 700, 705, *reh'g denied*, 650 F.2d 481 (3d Cir.1981)).  Accordingly, his decision was not in error.


## IV.    Conclusion

It is undeniable that Plaintiff has a number of impairments, and this Court is sympathetic and aware of the challenges which Plaintiff faces in his daily life.  Under the applicable standards of review and the current state of the record, however, the Court must defer to the reasonable findings of the ALJ and his conclusion that Plaintiff is not disabled within the meaning of the Social Security Act.

For these reasons, the Court will grant the Motion for Summary Judgment filed by the Commissioner and deny the Motion for Summary Judgment filed by Plaintiff.

An appropriate Order follows.


McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JOSEPH LAMACCHIA,                          )
                                           )
              Plaintiff,                    )
                                           )
       v.                                   )        02:11-cv-00498
                                           )
MICHAEL ASTRUE,                            )
COMMISSIONER OF SOCIAL SECURITY,           )
                                           )
              Defendant.                    )

**ORDER OF COURT**

**AND NOW**, this 9th day of April, 2012, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED, AND DECREED** that:

1.     Defendant's motions for summary judgment is **GRANTED**.

2.     Plaintiff's motion for summary judgment is **DENIED.**

3.     The Clerk will docket this case closed.

BY THE COURT:

s/Terrence F. McVerry
United States District  Court Judge

cc:     Kelie C. Schneider, Esquire
        Email: kschneider@peircelaw.com

        Paul Kovac,
        Assistant U.S. Attorney

22

Email: paul.kovac@usdoj.gov